**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

| | |
|---|---|
| Turtle Island Foods, SPC, d/b/a The Tofurky Company; and The Good Food Institute, Inc., | Case No. 18-cv-4173 |
| Plaintiffs, | EXPERT REPORT OF JULIE EMMETT, MBA |
| v. | |
| Locke Thompson, in his official capacity as Cole County Prosecuting Attorney and on behalf of all Missouri Prosecuting Attorneys;[1] and Chris Chinn, in her official capacity as the Director of the Missouri Department of Agriculture, | |
| Defendants, | |
| State of Missouri, | |
| Intervenor-Defendant.[2] | |

**Expert Report of Julie Emmett
Grocery Retail Marketplace expert**

### I.   Qualifications

1.      A true and correct copy of my *curriculum vitae*, attached as Exhibit A, outlines my background, education, and professional experience. As set forth in my *curriculum vitae*:

2.      I attended San Francisco State University from 1983 – 1988 during which time I began my career in the food industry. During that period, I worked 30 hours per week for Bradshaw Incorporated, a food broker. My sales territory included 300 convenience stores and distributors spanning Santa Rosa, California to Santa Maria,

---

[1]      Locke Thompson has succeeded Mark Richardson as Cole County Prosecuting Attorney and is automatically substituted for Richardson. *See* Fed. R. Civ. P. 25(d).

[2]      On December 7, 2018, this Court granted State of Missouri's request to intervene. ECF No. 33.

1

California. My responsibilities included selling confection brands directly to these outlets.

3.      In 1988, I received my B.S. in Industrial Marketing and began full-time with Bradshaw Incorporated as a Brand Manager. In that role I managed sales in Northern California for brands including Pillsbury, Nabisco, and Campbell's. While at Bradshaw Incorporated, I served as Director of Grocery for two years, which was the largest department in the company.

4.      In 1998, after 12 years at Bradshaw Incorporated, I began to work directly with Nabisco Foods as Regional Customer Marketing Manager. While at Nabisco, I created brand marketing programs for retailers. I was then promoted to Director of Marketing, where I was responsible for product development, finance, and marketing at the national level.

5.      In 1999, I received my MBA from St. Mary's College. When Kraft purchased Nabisco in 2001, I took a position as National Account Manager for Safeway. In that role, I was responsible for managing one of Kraft's largest brand portfolios — beverages. This included Capri Sun and Maxwell House Coffee among other brands. In this role I routinely managed multi-million trade and marketing funding to achieve sales quotes, conducted sales forecasting, negotiated pricing, created unique sales solutions and promotions, and monitored supply chain and logistics efficiency across the 10 divisions of Safeway throughout the country. I also was in charge of ensuring purchase orders received by Kraft's distribution centers were delivered to Safeway's distribution centers on time and in full.

6.      In 2008, I was offered a position with Mars, a shopper marketing agency out of Detroit, creating national health-oriented campaigns for Safeway. After developing these campaigns, I worked with brands and retailers to maintain compliance with applicable federal laws.

2

7.      After four years, I accepted a position with SPINS, a data technology firm, specializing in health and wellness as an on-site Business Consultant at Albertsons, which merged with Safeway in 2015. My focus was on product development for the private label brands Open Nature and O Organics. Through this work I became familiar with the Plant Based Foods Association (PBFA), specifically when these brands launched frozen plant-based entrees.

8.      In 2018, I joined PBFA as a full-time consultant and began as Senior Director of Retail Partnerships in 2019 in order to further PBFA's work in the marketplace.

9.      During the past few years, my role at PBFA has evolved into Senior Director of Marketplace Development. I lead a team that conducts in-depth merchandising research, publishes annual retail data and state of the industry reports through the media, and creates industry marketing initiatives through retail partnerships. I regularly speak on and moderate industry panels. I work directly with nationwide retailers such as Kroger, Walmart, Ahold, and Whole Foods Market, among others, to help guide their long-term plant-based foods strategy. I strive to ensure that PBFA remains a thought leader at the forefront of a growing and innovative plant-based foods industry throughout my work.

10.      As a volunteer, I worked for over 20 years with the Valley Humane Society and even served as the Wellness Chair for the Pleasanton Unified School District for two years.

## II.   Prior Deposition and Trial Testimony

11.      In my 36 years of professional experience, I have not previously provided deposition or trial testimony.

3

### III.    Statement of Compensation

12.    I performed the work in this matter, including reviewing data and materials and preparing this report, pro bono. This pro bono arrangement is not contingent on the outcome of this litigation.

### IV.    Basis for Opinions

13.    My conclusions and analyses are reached by and through my long-term and in-depth experience in the grocery and marketing industry. In addition to this professional expertise, I have accessed and reviewed specific industry research, data, and reports.

14.    In connection with my detailed research, my 36 years of experience, and this report, I have reviewed numerous documents, including the studies listed below, the laws in dispute, the relevant Complaints, and industry articles, reports, and papers. For example, I reviewed the following:

- Plant Based Foods Association, Nielsen Retail Sales Data for Plant Based Foods, *available at* ttps://www.plantbasedfoods.org/wp-content/uploads/2018/05/NeilsenOne-PagerResults-1.pdf

- Plant Based Foods Association, SPINS 2021 Retail Sales Data for the Plant-Based Foods Industry, *available at* https://www.plantbasedfoods.org/2021-u-s-retail-sales-data-for-the-plant-based-foods-industry/

- POPAI 2014 Mass Merchant Shopper Engagement Study, Executive Summary Report *available for download at* http://www.popai.cz/files/publishing/shopper-engagement-study_5165.pdf

- RELEX Report, Winning the Food Fight: Best Practices for Managing Grocery Retail Supply Chains

- Slotting Allowances in the Retail Grocery Industry: Selected Case Studies in Five Product Categories, Fed. Trade Comm'n 11, 25 (2003)

- Paul N. Bloom et al., *Slotting Allowances and Fees: Schools of Thought and the Views of Practicing Managers*, 64(2) J. Marketing 92 (Apr. 1, 2000)

4

- Barbara Bean-Mellinger, *What is the Profit Margin for a Supermarket?*, Small Business (Nov. 14, 2018), https://smallbusiness.chron.com/profit-margin-supermarket-22467.html (last visited Apr. 8, 2022)

- Lars Perner, *Channels of Distribution: Retailing, U. of S. Cal.: Consumer Psychol.*, https://www.consumerpsychologist.com/dist_Retailing.html

- Akshay R. Rao, Humaira Mahi, *The Price of Launching a New Product: Empirical Evidence on Factors Affecting the Relative Magnitude of Slotting Allowances*, 22(2) Marketing Science 246-268 (2003)

- Pinya Silayoi & Mark Speece, *The Importance of Packaging Attributes: A Conjoint Analysis Approach*, 41 Eur. J. Marketing 1495, 1498–99 (2007)

- Warren Thayer, *Vendors Push Back on Slotting, Frozen & Refrigerated Buyer*, 21–22 (May 2015)

- Verónica H. Villena et al., *The Dark Side of Buyer-Supplier Relationships: A Social Capital Perspective*, 29 J. Operations Mgmt. 561, 571–73 (2011)

15.　　I also read and review publications, news, articles, research reports and papers on a near-daily basis that provide me with information that I used as a reference for this report. I reviewed articles and conducted research into retail and distribution barriers.

16.　　I confirmed my understanding and opinions with various nationwide retailers and the most prominent nationwide wholesale distributors.

## V.　Assignment and Materials Reviewed

17.　　I was asked to provide analysis of the marketplace and provide an explanation of market mechanisms, retail-brand partnerships, the stream of commerce—including control of products' ultimate distribution—and analysis of the factors that affect a brand's ability to be sold nationwide or regionwide.

18.　　I reviewed the Complaint, the law being challenged, Plaintiff Tofurky's website and labels, and applicable state and federal labeling laws.

## VI.    Summary of Opinion

Grocery retailers and distributors will not carry brands if those brands would have to be distributed differently depending on the state or region. Separate label requirements on a state-by-state basis would force retailers and distributors to cease carrying plant-based meat products at all if they could not sell them uniformly on a nationwide basis.

## VII.    Opinions

19.    Based on the above-referenced research and analysis, as well as the experience summarized in paragraphs one through 16 and Exhibit A, I offer the

following opinions regarding the operations of and effects of state-specific labeling requirements on nationwide and interstate sales of plant-based products.

### A. Background: How packaged food products reach consumers

20. The production, distribution, and sale of retail food products is effectively shown in the graphics below, which provide information on how the supermarket model is constructed and the details of retail relationships:



21.     Another simple but good overview for understanding how the supply chain works is provided by Datex.[3]

22.     Most packaged food producers—including plant-based food producers—sell their products via retail grocery store chains. These chains have regional buyers who control what products are sold at the store level. Although sometimes grocery stores will roll out new products in limited regions at first, generally these stores will only decide to sell a certain product region-by-region if the product brand proves this is economically worthwhile and presents a sizable opportunity. Thus, at the end of the day, grocery retailers decide which products to shelve, whether to carry them at all, and mostly will not tolerate any limitations on their discretion. Producers themselves do not control where their products are distributed.

23.     Brands use a combination of e-commerce both direct to businesses and direct to consumer, regional distributors, national distributors, or direct to retailers from their own warehouses. Many nationwide grocery retailers buy direct from companies that have a large enough business value with them.

24.     Some smaller grocery retailers buy their products through aggregate distributors or brokers like Abound, Mable Wholesale, and FAIRE.com. These distributor "middlemen" provide services like sourcing, warehousing, as well as distribution. There are also larger wholesale distributors like UNFI (United Natural Foods) and KeHE that sell products wholesale to grocery stores like Kroger or Safeway. Food brands may sell their products directly to these distributors who then 'take over' in terms of where those products ultimately end up—both in terms of geographic locations and retailers. These wholesale distribution companies will not accept products

---

[3] Datex Corp., How the Supply Chain Works, https://www.datexcorp.com/how-the-grocery-supply-chain-works/

that come with geographic caveats—like ability to be sold or distributed in one state or region but not another.

24. Increasingly, online retailers like Amazon play a role in how consumers access packaged food products. But unlike relationships between grocery retailers and brands, online retailers represent an "all-or-nothing" agreement. If a brand elects to be sold on Amazon for example, once its products are provided to Amazon, only Amazon's algorithms control where the products are marketed and where they ultimately get delivered. To be placed on online retailers in the first place, brands must commit to checking compliance themselves and providing uniform packages that can be legally sold in all states. These retailers will not—and frankly cannot—choose to distribute to some states but not others.

### B. Current state of the plant-based market

24. When I speak of the plant-based industry, I am referring to foods made from plants that contain no animal-derived ingredients that provide an alternative to animal meat and dairy products. These include substitute meat and dairy products, like plant-based meats, plant-based milks and cheeses, plant-based eggs, and the like. These types of companies are growing at a rapid rate. Sales are up 6% in dollar sales in 2021 over 2020—which was a record year of sales. 2020 had growth of 27%, which was twice the growth of 2019. Total sales of plant-based products currently top $3.3 billion.

25. Plant-based offerings are available in all 50 states—with large grocery chains like Kroger, Albertsons, and Whole Foods as well as big box stores like Walmart, Costco, and Target, carrying small plant-based brands.

26.     The plant-based industry has grown astronomically in recent years. But although plant-based foods dollar sales are outpacing dollar sales of all retail foods by 3x, the animal-based foods industry is a behemoth in comparison.[4]

27.     Many plant-based companies are so-called "mom and pop" businesses—with very few full-time employees on staff and limited financial resources. The size of plant-based food companies varies in size from $150k to $1B per year in 2021. These companies exist nationwide, but I am personally aware of only one plant-based meat producer with production facilities in Missouri. That said, even the smallest producers can be sold nationwide, thanks to massive online retailers like Amazon.

28.     To illustrate the state of the market: In 2021, plant-based meat's dollar share was 2.7% of retail packaged meat sales, or 1.4% of the total meat category. That means the overwhelming majority of grocery store sales are attributed to non-plant-based brands.

### C. Relationship between plant-based brands and retailers or distributors

24.     Along with size comes resources, including the ability to invest in marketing and negotiating retail partnerships. When a company is as large as Tyson or Cargill, it possesses certain negotiating power with retailers and distributors that smaller food companies like Tofurky lack.

25.     But even though big food companies have much bigger marketing budgets, both big and small brands alike rely heavily on in-person packaging and point-of-sale experience to reach consumers and sell their products.[5]

---

[4] Nielsen Retail Sales Data for Plant Based Foods, available for download at https://www.plantbasedfoods.org/wp-content/uploads/2018/05/NeilsenOne-PagerResults-1.pdf

[5] *See, e.g.*, Pinya Silayoi & Mark Speece, *The Importance of Packaging Attributes: A Conjoint Analysis Approach*, 41 Eur. J. Marketing 1495, 1498–99 (2007).

10

26.     Packaging is the bearer of brand message and plays a central role in market entry and consumer acceptance. Most of a product's marketing to consumers occurs when consumers encounter products on grocery store shelves. A recent consumer engagement survey found that 76% of consumer purchasing decisions were made in stores.[6]

27.     That means it is imperative for brands to be on grocery store shelves, and in order to do that, they *need* robust, reliable, and influential relationships with retailers.[7] Influence with retailers comes in the form of helping their bottom line—if brands are unable to meet retailers' needs by easily, reliably, and uniformly providing products to stock shelves, those relationships will come to an abrupt end.

28.     Retailers in many ways hold all the cards. They require a certain, specified amount of product that they can distribute to their stores at their discretion.[8]

29.     The pandemic caused unprecedented challenges to the retail industry for both brands and retailers. This is due in part because large brands who already had robust contacts with retailers could maintain those connections during COVID-10, but emerging brands who lacked those pre-existing relationships could not create them during the pandemic, as in-person meeting were not an option. The plant-based foods industry's largest trade show, Expo West, which has typical attendance rates of over 90,000, was canceled the day before it began on March 16, 2020, leaving the many in the industry with no means of conducting business or establishing relationships with

---

[6] *2012 Shopper Engagement Study*, Point of Purchase Advert. Int'l 4, http://www.popai.cz/files/publishing/shopper-engagement-study_5165.pdf.

[7] *See* Verónica H. Villena et al., *The Dark Side of Buyer-Supplier Relationships: A Social Capital Perspective*, 29 J. Operations Mgmt. 561, 571–73 (2011) (explaining how purchasing power and performance perceptions may affect buyer-supplier relationships).

[8] *See* Lars Perner, *Channels of Distribution: Retailing*, U. of S. Cal.: Consumer Psychol., https://www.consumerpsychologist.com/dist_Retailing.html.

retailers, distributors, or food service providers. This hurt the plant-based foods industry particularly hard because hundreds of companies with new brand offerings could not make contact with those retailers, distributors, or food service providers to gain distribution. Many plant-based brands were forced to close their doors.

30.     Even aside from the pandemic, brands experience extraordinary challenges to keep the cost of their products competitive. This is in large part due to the extremely thin margins for retail food products—ranging from about one to three percent.[9]

31.     Marketing programs exist to ensure that products catch the attention of shoppers and entice them to purchase in order to meet velocity thresholds.[10] Brands must invest heavily in marketing because retailers usually give them a three-month period to meet these thresholds, or they are discontinued. This can happen even after making significant investment in not only the production and packaging of their products, but in warehousing, transportation, research and development costs, and labor to produce and sell.

32.     For the narrow balancing act that is packaged food sales, the situation is the most tenuous for the brands themselves: Companies' brand margins include not only their own, but also the margins of distributors (if they use one) and retailers. The cost that retailers impose not only includes the cost of goods but also the costs of slotting fees and sizable marketing programs.[11]

---

[9] Barbara Bean-Mellinger, *What is the Profit Margin for a Supermarket?*, Small Business (Nov. 14, 2018), https://smallbusiness.chron.com/profit-margin-supermarket-22467.html (last visited Apr. 8, 2022).

[10] Velocity thresholds are the amount of product that must be sold per store for that product to remain carried by that retailer (usually measured in number of units sold per week).

[11] *See* Warren Thayer, *Vendors Push Back on Slotting*, Frozen & Refrigerated Buyer 21–22 (May 2015), *available at* https://frbuyer.com/wp-content/uploads/2015/05/2015-05-

33.     Slotting fees are fees charged by food retailers to food producers for the right to have their products in the store. Slotting fees shift the risk of new product introductions to brands rather than grocery retailers—they are just one way that retailers exercise market power.[12] But for small companies, slotting fees are often applied in a discriminatory fashion and lead to higher retail prices for the affected products.[13] Slotting fees also mean that the smaller the company, the harder it is to penetrate the market and make it to grocery store shelves.

34.     One study provides an apt summary of slotting fees: "relatively powerless manufacturers are asked to provide credible commitments regarding postlaunch activities and are asked to pay relatively high slotting fees. Among manufacturers, the relative magnitude of slotting fees paid is lower for those who have a strong market share position."[14] In short, brands pay retailers to be on grocery store shelves, investing significant financial resources to keep grocery stores happy and to be accessible to consumers. This trade spend is a huge barrier to entry for smaller companies—meaning that shelves are stocked mostly by the biggest players (and online retailers may become increasingly important to the economic viability of smaller producers). Not only do retailers control the most significant marketing opportunity for plant-based brands, but they also have the luxury of being able to pick and choose from an abundance of food

---

FRBuyer-May2015.pdf (stating that some vendors expect to spend near 15% of total product sales on marketing and promotion and 1% of total sales on slotting fees).

[12] *Slotting Allowances in the Retail Grocery Industry: Selected Case Studies in Five Product Categories*, Fed. Trade Comm'n 11, 25 (2003), *available at* https://www.ftc.gov/sites/default/files/documents/reports/use-slotting-allowances-retail-grocery-industry/slottingallowancerpt031114.pdf.

[13] *See, e.g.*, Paul N. Bloom et al., *Slotting Allowances and Fees: Schools of Thought and the Views of Practicing Managers*, 64(2) J. Marketing 92 (Apr. 1, 2000).

[14] Akshay R. Rao, Humaira Mahi, *The Price of Launching a New Product: Empirical Evidence on Factors Affecting the Relative Magnitude of Slotting Allowances*, Marketing Science 22(2):246-268 (2003).

13

products vying for shelf space. In my experience, retailers only carry those food products they want to—and any difficulty or perceived obstacle will be met with those retailers eschewing those products entirely.

### D. Necessity for uniform labeling to ensure interstate commerce retail and distribution

35.     Getting to shelves in stores is the single largest barrier to entry and determining factor to brand success. Brands don't see where products go and cannot place limitations on geographic distribution without endangering retailer-relationships. The only way this works is if labels are the same (and legally compliant) no matter where the products get sold.

36.     As discussed above, retailers determine where products are sold once the brand makes their presentation. Retailers and distributors have absolutely no interest in carrying products in some of their stores or regions, but not others—depending on the state. This is because retailers generally do not sell by state, they sell by retailer (i.e., you might get your products in all Trader Joe's nationwide or none of them). Most U.S. retailers have stores located across multiple states. What's more, distributors neither have the ability nor inclination to send some products to some of their buyers and not to others; they will often choose to drop products if they cannot distribute them uniformly nationwide.[15]

37.     Although retailers may have the ability to carry certain products in just some of their stores, this does not apply to all retailers, and even the ones with this capacity do so at *their* discretion. In other words, they would do so not as a result of a *brand's* request for them to to work around a brand's inability to meet the retailer's

---

[15] *See, e.g.*, *The Grocery Distribution Center Network in North America*, MWPVL, https://www.mwpvl.com/html/grocery_distribution_network.html (explaining retail grocery store distribution networks and showing the main warehouse distribution centers are located in Los Angeles, Atlanta, Chicago, and Northern New Jersey/Eastern Pennsylvania).

Case 2:18-cv-04173-FJG   Document 141   Filed 12/15/22   Page 14 of 24

needs, but instead in order to sell as much of a product wherever the retailer deems is appropriate for optimal sales. There is no shortage of options of brands that do not have limitations to take the place of a brand that does.

38.    Retailers do not have a system to warehouse certain products with certain labels only for stores in one area, like Missouri. If a brand must have certain labeling for Missouri alone, a retailer will not accept that brand for distribution. This is true for distributors, too, and is especially true for online retailers, who often do not even know which products end up where.

39.    When large retailers were questioned whether they would carry products in certain stores or states but not others—at the request of a brand, one nationwide retailer responded that they would not expect such a request from a brand, and they could not execute a single state strategy in response to that request; from a supply chain perspective, even a law or a court order could result in this response. For large retailers that cross multiple states, such a strategy is simply not feasible.

40.    It is an insurmountable burden in terms of sales and distribution to have brands fundamentally change their label in such a large way for one state alone. This is distinct from small changes e.g., adding a certification, because certification requirements and the like do not fundamentally change the brand in such a large way that is so unique to the rest of the country.

41.    This hurdle does not apply just to small plant-based brands, however. Such requirements would impact the branding for the entire industry. One of the nationwide companies interviewed above also pointed out that they have significant offerings and investment in private label plant-based offerings that would no longer be viable in any of their stores.

42.    One of the nation's top natural wholesale food distributors with distribution centers across North America likewise confirmed that state-specific labeling would undoubtedly cause significant harm and logistical issues in its nationwide

15

commerce. One reason among many is that creating a unique Universal Product Codes ("UPCs" or "barcodes") for a separate label leads to manual error and is not feasible in their systems. In short, this means that they could not carry such products, the entire chain of commerce would be affected, and the channel for these brands to reach consumers would be shut down.

43. When California—a state with a volume of commerce as high as 30% of the country—passed label requirements under Proposition 65, the nationwide distributor I spoke with noted that the sheer volume of commerce was ultimately deemed worth the gargantuan effort it required for that distributor to manage the change in distribution flow of certain labels. That said, the distributor confirmed that plant-based meat sales nationwide would not rise to the level of sales that would be worth it for them to develop the necessary logistical workarounds depending on different state laws. Instead, the distributor confirmed they would simply not be able to carry those products at all, in any state.

44. In my experience working with distributors, they place responsibility for compliance with all applicable labeling laws squarely on the producer companies. Distributors neither have the ability nor inclination to ensure compliance of all product labels in their network. This is equally true for online distributors like Amazon. This is because the function of distributors is to facilitate and enable nationwide distribution.

45. In my experience working with various retailers and grocery stores (e.g., Albertsons, Walmart), I have seen that while retailers *are* committed to labeling compliance, this means that, as a result, if a brand makes it difficult for a retailer to be in compliance with applicable regulations and laws, they will not carry that brand at all. Thus, it is up to brands to ensure compliance with applicable labeling laws—which, given the way brands reach grocery shelves, is only possible thanks to a nationwide uniform labeling scheme. The necessity of nationwide labeling conventions to enable

producers to do business is good common sense, business sense, and has even been acknowledged by Congress (in the form of the federal Food, Drug and Cosmetic Act).

46.     Without uniform nationwide labeling requirements, brands would presumably need separate labels for each state or region. This would stymie and effectively kill nationwide distribution of packaged food products, including plant-based food products. Retailers and distributors need to have reliable inventory, uniform products to distribute at their discretion nationwide, and constant, uniform flow. The security that comes with uniform nationwide labeling requirements benefits brands, retailers, and distributors.

47.     Given the fact that retailers have regional and national distribution, brands do not have the resources to create specific labels, nor do they have the ability to distribute only those products that comply with state-specific packaging requirements to a retailer. As explained above, distributors and retailers are ultimately in charge of the distribution of products—which only works on a nationwide or region-wide basis if the products are identical across state lines.

48.     If different products had to be distributed by state or region, they would have to be distributed by the producers themselves. Right now, around 13% of the market consists of direct-to-consumer (DTC) sales by packaged food producers. The remaining 87% of the market consists of retailer-distribution. If this model of distribution became the norm, the resources (type and amount) necessary for packaged food distribution by producers couldn't even be mustered by the largest brands that I have worked with.

49.     I have worked with labeling changes at various points throughout my professional career. Through my experience with Albertsons, I was witness to the arduous process of having to revamp its private label product labeling for non-GMO labeling in response to the National Bioengineered Food Disclosure Standard established in 2016. The law required certain labels for products that contained more

17

than 5% bioengineered ingredients. This process took over two years and involved tremendous resources to accomplish. Throughout my experience working in the grocery retail industry, profit margins for grocery retailers proved similarly low, between 0.5 - 4.5%. As a result, supply chain efficiency is always a top priority to maintain solvency. In other words, grocery retailers will never take on risk or logistical obstacles for less-than-central products—this would not include small producers with even smaller financial contributions to grocery stores' bottom lines. Instead, a patchwork of labels depending on state or region-specific distribution and retail would be sufficient reason for retailers to drop the "difficult" products entirely.

50.    If the Missouri law stands, there is not a distribution system currently in place to accommodate its different packaging and label requirements. And even if brands could create new UPCs solely for Missouri, such separate state-by-state requirements would create tension in retailer relationships, and the brand would likely lose the relationship with its retail partners—not just in Missouri, but nationwide. These retailers would simply choose not to carry a product if they could not carry the same product in all of its stores.

51.    In 2021, sales of plant-based foods were $7.4B, which represents only 1.5% of total grocery store sales. Given the vulnerable position inherent in constituting such a small percentage of overall sales, if plant-based brands were discontinued by retailers due to Missouri's unique labeling requirements, the implications would be devastating—it could potentially wipe out the entire industry.

**VIII.    Conclusion: Brands cannot both comply with the Missouri law and remain in the marketplace**

52.    Grocery retailers will not contract with brands if they would be forced to distribute differently depending on the state or region. For better or worse, the existing system does not allow brands to determine where their products are distributed and sold. Instead, brands contract with retailers and sometimes wholesale distributors who

make that determination.[16] And, as I stated above, these entities would choose not to carry products at all if they could not sell them uniformly and without concern about avoiding particular States or regions.

53.     In my opinion, and given my experience working with brands, retailers, and distributors, the law at issue here will render it impossible for brands to market and distribute their plant-based meat products nationwide.

I declare under penalty of perjury that the foregoing is true and correct.

Executed May 5, 2022.

_Julie Emmett_
Julie Emmett, MBA

---

[16] And they can do this because legally they own the products at this point—not the brands.

# Exhibit A

# Julie Anne Emmett

jaemmett@comcast.net    510.284.9637     7728 Knollbrook Drive, Pleasanton, CA 94588

### Thought Leader and Expert in the Plant Based Foods Industry

Accomplished leader in strategy, organizational design, and team development. Progressive achievement in sales and business development through marketing, research, and product innovation. As an expert in the field, I see plant-based foods and diets as a path forward for improved human and planetary health.

I launched PBFA's Marketplace Development Team, Retail Advisory Council, sit on the Advisory Council for Plant Based World and Indoor Ag-Con, and often speak on behalf of PBFA on panels, webinars, and podcasts to help educate about the significant business opportunity, as well as the positive impact on health, sustainability, and animal welfare, that plant-based foods provide.

I possess a laser focus on building partnerships to help grow the plant-based foods industry to help improve our food system.

---

## PROFESSIONAL EXPERIENCE

**Plant Based Foods Association, San Francisco, CA**

Senior Director, Marketplace Development                                *April 2018 - Present*

- Developed the Marketplace Development team to advance the industry through impactful research, data analysis, and unique business opportunities for our members through our retailer and NGO partnerships. The data and research we provide creates a collective understanding throughout the industry about the billions of dollar opportunity for plant-based foods as well as practical ways to leverage this opportunity through merchandising and marketing best practices.

- Create annual U.S. retail data state of the industry reports, publishing through both mainstream media and trade publications guide the industry to better meet consumer demand.

- Develop trusted, long-term partnerships with Walmart, Kroger, Ahold, Target, Albertsons among others to support and guide their strategy for plant-based foods and provide value to our members.

- Partner with Kroger for their Vegfest event and Kroger Wellness events each year, providing both Kroger and member brands to grow their business.

- Created an integrated marketing event with Hannaford and Lucky Supermarkets for brands across all categories throughout the store, which increased sales by double digits versus prior period and prior year growth.

- Conducted control store test research with Kroger to demonstrate the importance of merchandising best practices to meet consumer demand. Sales increased 23% and published in the media to inform the industry

- Partner with key retail partners including Kroger and Walmart to help build their plant-based ecommerce presence.

- Speak and moderate on multiple panels per year to help educate the industry about plant-based foods growth insights.

**SPINS, LLC - Pleasanton, CA**

*On-Site Business Consultant – Albertsons Safeway*                                   *Oct 2012 – Present*

- Performed robust analysis of natural and organic product development information, providing expert ingredient and attribute recommendations for private label portfolio.

- Created and delivered sales presentations to Albertsons Executive team to ensure successful implementation of recommendations.

- Elected leadership position for the 2018 Innovation Summit resulting in an improved process to leverage unparalleled insights into successful product development.

- Elected leadership position for the 2015 Natural and Organic Product Innovation process involving a cross-functional team analyzing over forty key categories. Resulted in 102 new, innovative products successfully launching and generating $360MM in 2016/2017.

- Provided finance team with earnings analysis and performance for Board of Directors.


**MARS Advertising LLC – Oakland, CA**

*Director, Shopper Marketing*                                                 *May 2008 – Sept 2012*

- Managed Walmart Shopper Marketing for Abbott Nutrition. Developed and led strategic platforms including digital and social media as well as in-store shopper engagement programs.

- Led Safeway's multi-vendor category events, leveraging primary research, shopper insights

- Implemented Safeway Just for U and ecommerce targeted platforms, which resulted in nine campaigns and a 130% increase in sales.

- Developed Abbott Nutrition's Safeway Shopper Marketing team, resulting in the first ever Diabetes campaign and Baby category event, both delivering incremental sales growth of +21% and 14% respectively.


**KRAFT Foods (Post Merger with Nabisco) – Pleasanton, CA**

*Senior National Account Director, Safeway*                                 *April 2003 to May 2008*

- Managed Kraft Beverage Headquarter Sales Planning by aligning Kraft and Safeway growth strategies and proactively identifying business-building opportunities.

- Created a cross-functional team to execute a custom, equity-building sales solutions for Safeway, generating over $3MM in incremental sales and remained in use for over three years.

- Created and implemented a Kraft mentoring program and Best Practices quarterly workshop

*National Account Manager, Safeway*                                         *September 2001 to March 2003*

- Managed Kraft Beverage Division for Safeway totaling $130 MM in annual sales, increasing Safeway market share of a mature portfolio by six share points to 72%, exceeding US share of 59%.
- Established Kraft as the "gold standard" of vendor partners. Generated an incremental $14.8MM in incremental sales for first-ever corporate programs, growing sales by 24%.
- Served as primary contact during Safeway centralization process, providing key insights enabling Kraft to build a relevant structure and formidable team.

## Nabisco Foods Company – Pleasanton, CA

*Director, Customer Marketing, Confections*                    *October 1999 to September 2001*

- Developed and implemented strategic business plan for Nabisco Confections ($110MM) for seven customer teams nationwide. Led integration of Nabisco's largest acquisition, Favorite Brands International. Created and conducted training throughout region.
- Managed the Customer Marketing team to profitably grow confections business through consumer insights and advanced category management tools.

*Director, Customer Marketing Nabisco Headquarters, New Jersey*          *May 1999 to October 1999*

- Developed and implemented strategic business plans nationally ($2B) through coordination of product development, finance, logistics, marketing, and operations. Exceeded both revenue and profit targets by 8% and 5% respectively through profitable new distribution and increased consumption +10.9%
- Managed Customer Marketing team. Reorganized department by dedicating resources by sales channel (Club, Mass, Drug and Grocery) to increase focus and leverage market expertise.

*Manager, Customer Marketing*                         *February 1998 to April 1999*

- Created brand value while exceeding sales volume goals through local marketing programs. Created and negotiated Safeway Corporate meat rack contract with each division, resulting in mandatory placement of 1600 custom meat/poultry racks, generating $1.3MM in incremental sales.

## CROSS MARK (formerly Bradshaw Inc. North)- Pleasanton, California

*Director, Grocery*                              *October 1997 to January 1998*

- Managed grocery sales team responsible for $135MM in sales, exceeding growth targets YOY

*Group Business Manager*                         *January 1994 to September 1997*

- Led Brand Management team in strategic planning for $7MM portfolio
- Developed a Brand Management training seminar and formal mentoring program

*Brand Manager*                               *January 1990 to December 1993*

- Managed major brands totaling $24MM in sales for Safeway Headquarters. Grew portfolio 32% through comprehensive marketing programs, new product launches, and long-term contract proposals

*Retail Sales Manager*                            August 1988 to January 1990

- Managed a sales territory of 300 convenience stores and distributors for Bradshaw's confections and snacks department by creating sales presentations, ensure shelves were fully stocked, and meeting the goals of brands and retailers. Exceeded sales quotes each quarter in this position.

## EDUCATION

**Master's of Business Administration**, Saint Mary's College, Moraga, California, December 1999

**Institute of Integrative Nutrition, April 2013:** Certified Health Coach

**Bachelor of Science in Industrial Marketing**, San Francisco State University, May 1988